**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **OSCAR PORTER,** | **Civil Action No. 17-2796 (MCA)** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **STEVEN JOHNSON,** *et al.*, | |
| **Respondent.** | |

APPEARANCES:

Paul John Casteleiro
1000 Herrontown Road
Princeton, NJ 08540
      On behalf of Petitioner,

Kayla Elizabeth Rowe
Acting Assistant Prosecutor
Essex County Prosecutor's Office
50 West Market Street
Newark, NJ 07102
      On behalf of Respondents.

**Arleo, United States District Judge**

## I.    INTRODUCTION

    Petitioner Oscar Porter ("Petitioner"), a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has filed a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (D.E. No. 1). For the reasons explained in this Opinion, the Court will deny the Petition and will deny a certificate of appealability.

## II.       FACTUAL BACKGROUND & PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal as well as on appeal of the PCR decision.[1]

> [David] Veal testified that in the very early morning hours of September 11, 2003, he was using a pay telephone outside of his apartment building in Newark when three men approached him. By the time Veal was ready to hang up the telephone, the three men, each with a handgun, had surrounded him and one of them told him, "don't move, don't even look at me like that." According to Veal, "one guy ... [b]oom, hit [him] in [his] face ... with a gun" and knocked him to the ground. Veal subsequently identified that man as defendant. According to Veal, he saw defendant before he came up to him. As defendant approached, defendant "pulled his hoodie up" on his head. Defendant was about eighteen feet from Veal when this happened. The hoodie remained on defendant's head throughout the incident. However, Veal testified that he was able to get a good look at defendant before he had pulled up the hoodie.
>
> Veal testified that the other two individuals carried him around the corner into an alleyway on the side of his apartment building. Defendant told him to get on his knees and to put his hands behind his head. Veal gave them forty dollars, and, as ordered to, knelt and interlocked his hands, and placed them on his head underneath his own hoodie.
>
> The other two assailants left for about five minutes and returned with another man, later determined by investigators to be Ashford. According to Veal, neither he nor Ashford knew any of the assailants. The men told Ashford to kneel next to Veal. Defendant was holding a gun to Veal's head, and another assailant was holding a gun to Ashford's head. The third assailant left briefly and returned with a vehicle. The man standing over Ashford shot him in the head, killing him. At the same time, defendant fired a shot at the back of Veal's head. Because Veal's hands were clasped behind his head, the bullet hit his thumbs and grazed his skull. Veal fell to the ground and remained still, pretending to be dead until he heard the three assailants leave. He then ran into his apartment building.

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

*State v. Porter*, 80 A.3d 732, 734-35 (N.J. Super. Ct. App. Div. 2013).

Defendant, Oscar Porter, was charged in a nine-count indictment with second-degree conspiracy, *N.J.S.A.* 2C:5-2, -4, and *N.J.S.A.* 2C:15-1 (first count); two instances of first-degree robbery, *N.J.S.A.* 2C:15-1 (second and fifth counts); first-degree attempted murder, *N.J.S.A.* 2C:5-1 and *N.J.S.A.* 2C:11-3 (third count); second-degree aggravated assault, *N.J.S.A.* 2C:12-1b(1) (fourth count); felony-murder, *N.J.S.A.* 2C:11-3a(3) (sixth count); purposeful and knowing murder, *N.J.S.A.* 2C:11-3a(1), (2) (seventh count); third-degree unlawful possession of a handgun, *N.J.S.A.* 2C:39-5b (eighth count); and second-degree possession of a handgun with purpose to use it unlawfully, *N.J.S.A.* 2C:39-4a (ninth count).

During a three-day trial, the testimony disclosed the existence of two victims, one who died from a gunshot wound to the head, and the other who was wounded and who testified as a witness for the State. Counts Two, Three, and Four dealt with the crimes allegedly committed on the surviving victim. Counts Five, Six, and Seven referred to the deceased victim. Counts One, Eight and Nine contained charges relating to both victims. The central issue in the trial was identification.

Jury deliberations began on the third day, June 14, 2005, at 12:14 p.m. On June 15, at 4:25 p.m., after informing the court that it could not reach a verdict on one of the counts, the jury announced it was prepared to report its verdicts on the remaining charges. The court took the verdicts in the order of the counts charged, the foreperson reporting guilty verdicts on Counts One, Two, Three, Four, Six, Eight, and Nine. The foreperson reported a not-guilty verdict on the first-degree robbery charge in Count Five and the jury's inability to reach a verdict on the murder charge in Count Seven.

The court then proceeded to poll the jury. The jurors signified unanimous agreement with the reported guilty verdicts on Counts One, Two, Three, and Four; and with the not-guilty verdict on Count Five. During the poll on Count Six, as the court reached the fourth juror to respond, Juror Number Six, the following colloquy occurred:

THE COURT: [Juror] Six.
JUROR: Yes. I'm sorry, I have to be honest.
[DEFENSE COUNSEL]: What did you say, judge?
THE COURT: You['re] saying no, this is not your verdict?
JUROR: No. I'm sorry, I have to be honest.

3

THE COURT: Okay. You're saying no[,] this is not your verdict. All right. You know what we're going to do, ladies and gentlemen, we're going to return tomorrow morning at 9 o'clock to resume deliberations in this case.

The jurors were then excused until the following morning.

When the matter resumed the next morning, the judge, out of the jury's presence, summarized for the record what had occurred during the rendering of the verdict the afternoon before, referring to *State v. Milton,* 178 *N.J.* 421 (2004); *State v. Jenkins,* 349 *N.J.Super.* 464 (App.Div.2002); and *State v. Millett,* 272 *N.J.Super.* 68 (App.Div.1994), and said: "As far as the Court's concerned, we received final verdicts on Count 1, 2, 3, 4, 5. We did not receive final verdicts on Counts 6 and 7. They need to be polled on Counts 8 and 9." The court continued: "it was apparent that [juror six] changed her mind, and she had a right to that because the verdict on Count 6 was not final until each juror gave their as[s]ent thereto."

The judge also commented on the "highly charged atmosphere [the day before] when we took this verdict[,]" noting that when the initial verdict was announced in court as guilty on felony murder, ... a member of the defendant's family ran out of the courtroom screaming and crying. Again, to add to the highly charged emotional atmosphere. * * * I think it did have an effect on what Juror Number 6 did, but ... whether it did or didn't at that point in time at 4:35 in the afternoon, the Court decided to break the proceedings, and ask the jurors to come back today to continue in this matter.

He then described a ruling he had made:

I have indicated to my officers that there's not to be any members of the defendant's family or the victim's family in the courtroom this morning while I take the tally on the final two counts, and I have done that because of what occurred yesterday afternoon because it had the potential to [a]ffect the final votes on the polling of these jurors, and it could just as easily be the victim's family member who could run out and start carrying on, too. I'm doing it for security reasons.

The judge went on to detail his security concerns, including a shortage of sheriff's officers, concluding: "For all those reasons the Court cut short the proceedings, and quite frankly-and another reason the Court didn't know what to do."

4

Defense counsel then moved for a mistrial, stating that there was no way of knowing whether the difficulty announced by Juror Number Six bore only upon the sixth count charged or whether it related to Counts One through Five, as well. "We just can't be sure without discussing it in further detail with that juror what was meant. * * * I think it's somewhat inappropriate to talk to her about it.... [F]or that reason[,] I believe a mistrial is appropriate in this case." The prosecutor argued in response that the verdict had been flawlessly delivered as to the first five counts, and that the jury should be asked to continue deliberating on the remaining charges and report back on them. The court ruled: "There are final verdicts on Counts 1 through 5. Each juror was given the opportunity to say yes or no to show their final as[s]ent or non [-]as [s]ent to Counts 1 through 5. They all unequivocally unambiguously said yes on Counts 1 through 5."

Defense counsel noted that he had observed the preceding day that Juror Number Six "got more and more upset" as the polling on each of the first five verdicts proceeded, "[s]hook her head, and shook her head, and finally that's it and gave an answer." The judge stated: She said yes on the first five counts, that's unequivocal, that's established in the record, and it's established she said yes on each of the first five counts. Not Counts 1 through 5[, e]ach one individually. When we got to Count 6, she said no. And I didn't see her shaking her head on either of the counts. I'll accept your representation, but, you know what, doesn't matter if she shook her head or not, she said yes.

Announcing, again, his reliance on *Millet* for the proposition that "each count of the indictment is regarded as if a separate indictment," and on *Milton*, the judge denied defense counsel's application for a stay to allow counsel to file an application with the Appellate Division.

You can appeal my decision. * * * [T]his Court went through no uncertain pains to make sure that no juror had been coerced ... to agree to the verdict [,] that he or she was not fully assented. * * * I'm not going to send them in to resume deliberations on Count 6 and 7 because I think that would be an attempt by this court to coerce a verdict. They have already told us they were hung on 6. On 7[,] we have a hung jury right now, and for the court to have him go in and redeliberate on Count 6 and 7, I think would be viewed as being coerced. * * * I'm going to take the verdicts on Counts 8 and 9 and discharge them.

The jury returned to the courtroom and the polling on counts eight and nine proceeded. Juror Number Fourteen asserted dissent from the previously reported guilty verdict on count eight; and two jurors, Numbers Eleven and Fourteen, declared their dissent in respect of count nine. After the court announced at sidebar that "I'm going to discharge this jury now, and then after they're gone we'll decide where we're going with the result of the case[,]" defense counsel stated:

I most strenuously seek a repolling of Counts 1 through 5. This has shown us today absolutely positively no doubt that this verdict was not right. That this verdict is not proper. It is not unanimous. * * * [T]hey have shown us today this verdict isn't unanimous from [sic] any of these counts, and it would be an injustice to [defendant] to allow these people to leave this courtroom without being told what in God's name happened.

The court ruled: "I'm not going to repoll the jurors' final verdicts on Counts 1 through 5, and I'm going to discharge the jury." Counsel again requested a recess so he could "go to the Appellate Division and ask them the question." That application was denied.

The court proceeded to discharge the jury, noting "you have rendered final verdicts on five of the nine counts of the indictment. The court is declaring a mistrial on the other four counts of the indictment through a hung jury."

Sentencing on Counts One, Two, Three, and Four occurred on September 8, 2005. After noting the applicability of the No Early Release Act, *N.J.S.A.* 2C:43-7.2, and the Graves Act, *N.J.S.A.* 2C:43-6c, to each of the convictions, the court sentenced defendant to an aggregate prison term of forty years, with parole ineligibility for eighty-five percent of the term. The aggregate sentence was comprised of a twenty-year term for the first-degree robbery conviction into which the conspiracy conviction was merged; a consecutive twenty-year term for attempted murder; and a concurrent ten-year term for aggravated assault. A previous commitment to probation was terminated without improvement, and the court ordered appropriate monetary assessments pursuant to law.

*State v. Porter*, Indictment No. 04-12-3785, 2007 WL 2460179, *2-4 (N.J. Super. Ct. App. Div.

Aug. 31, 2007).

The Appellate Division affirmed Petitioner's conviction and sentence but remanded the case to the trial court for the limited purpose of modifying the judgment to reflect a merger of the conviction on count four with the convictions on counts two and three. *Porter*, 2007 WL 2460179 at *6. The New Jersey Supreme Court denied certification on December 6, 2007. *State v. Porter*, 937 A.2d 978 (N.J. 2007).

After Petitioner's petition for post-conviction relief ("PCR") was denied without an evidentiary hearing, the Appellate Division affirmed the denial. *State v. Porter*, Indictment No. 04-12-3785, 2011 WL 3759644 (N.J. Super. Ct. App. Div. Aug. 26, 2011). The Supreme Court of New Jersey granted a petition for certification limited to the issue of whether defendant was entitled to an evidentiary hearing. *State v. Porter*, 41 A.3d 738 (N.J. 2012). The Supreme Court of New Jersey reversed the Appellate Division's decision and remanded to the Law Division for further proceedings related to Petitioner's ineffective assistance of counsel for failing to investigate an alibi defense and directed that the PCR hearing be assigned to a judge that had not previously decided the issues. *State v. Porter*, 80 A.3d 732, 740 (N.J. 2013). On remand, the PCR Court convened an evidentiary hearing (D.E. No. 6-7), and subsequently denied Petitioner's petition. (D.E. No. 1-6). The Appellate Division affirmed the PCR Court's denial. *State v. Porter*, Indictment No. 04-12-3785, 2016 WL 4575702 (N.J. Super. Ct. App. Div. Sept. 2, 2016). On January 20, 2017, the New Jersey Supreme Court denied Petitioner's petition for certification. *State v. Porter*, 158 A.3d 585 (N.J. 2017).

Petitioner filed the instant petition for habeas relief under § 2254 on April 24, 2017. (D.E. No. 1). Respondents filed their Answer on September 1, 2017. (D.E. No. 6). Petitioner filed a reply on November 15, 2017. (D.E. No. 9). The matter is fully briefed and ready for disposition.

Petitioner raises the following claims in his federal habeas petition:

1. Ineffective assistance of trial counsel for failing to investigate and call alibi witnesses. (D.E. No. 1-1 at 14-21).

2. Ineffective assistance of trial counsel for failing to move for a voir dire of juror number six. (D.E. No. 1-1 at 21).

3. Ineffective assistance of trial counsel for failing to challenge the sufficiency of the state's evidence with respect to the robbery charge related to David Veal. (D.E. No. 1-1 at 21).

4. The trial court erroneously closed the courtroom to the public. (D.E. No. 1-1 at 23).

5. The trial court erroneously failed to conduct further inquiry of juror number six after she made a comment that suggested she was uncomfortable with one of the verdicts. (D.E. No. 1-1 at 23-29).

## III.    STANDARD OF REVIEW

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts. *See Renico v. Lett,* 559 U.S. 766, 773 (2010).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court has "no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567

U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)).  Clearly established law for purposes of § 2254(d)(1) includes only "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  Moreover, a federal court reviewing the state court's adjudication under § 2254 (d)(1) must confine its examination to evidence in the record.  *Cullen v. Pinholster*, 563 U.S. 170,  181–82 (2011).  Finally, "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

## IV.   ANALYSIS

For the reasons explained in this section, the Court finds that Petitioner's claims do not warrant federal habeas relief.

### A.   Ineffective Assistance of Counsel

The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the defendant must show that counsel's performance was deficient.  This requirement involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Id.* at 687.  Second, the defendant must show that he was prejudiced by the deficient performance.  *Id.*  This requires showing that counsel's errors deprived the defendant of a fair trial.  *Id.*

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance."  *Id.* at 690.  In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must

be highly deferential." *Id.* at 689.  In addition, judges must consider the facts of the case at the time of counsel's conduct, and must make every effort to escape what the *Strickland* court referred to as the "distorting effects of hindsight." *Id.*  The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).  Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below Strickland's standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).  "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the Strickland standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S.Ct. at 1403).  Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.*  (internal quotation marks and citations omitted).  "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting *Strickland*, 466 U.S. at 697)).

1.  Ineffective assistance of trial counsel for failing to investigate and call witnesses.

The Court will first address Petitioner's claim that counsel was ineffective for failing to investigate and call witnesses, particularly an alibi witness. (D.E. No. 1-1 at 14-21). Petitioner was represented at trial by Mr. Gerald Saluti, Esq.

Petitioner submits that his counsel was ineffective for failing to investigate and call Katrina Adams and Rashana Lundy as defense witnesses. (D.E. No. 1-1 at 14-21). Petitioner alleges that Katrina Adams could have served as an alibi witness because she was at home with Petitioner at the time the offenses in question occurred. (D.E. No. 1-1 at 14-15). He further alleges that Rashana Lundy could have provided testimony about the nature of his relationship with victim, Rayfield Ashford. (*Id.* at 15).

On habeas review, the district court must review the last reasoned state court decision on each claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Petitioner raised this very claim on PCR and was granted an evidentiary hearing on this issue after the matter was remanded by the Supreme Court of New Jersey to the PCR Court for further proceedings. *See Porter*, 2016 WL 4575702 at *2-4. The Appellate Division affirmed the second PCR Court's denial citing New Jersey Rule 2:11-3(e)(2) adding the following limited comments.[2]

> As noted, our standard of review requires deference to the PCR judge's fact findings based on witness testimony. *Nash, supra*, 212 *N.J.* at 540. "In such circumstances we will uphold the PCR court's findings that are supported by sufficient credible evidence in the record." *Ibid.* Here, defendant has not shown that the judge's credibility findings were "so wide of the mark as to result in a manifest injustice." *State v. J.D.*, 211 *N.J.* 344, 354 (2012) (quoting *State v. Brown*, 170 *N.J.* 138, 147 (2001)). Based on his credibility findings, Judge Ravin properly determined that trial counsel's decision not to have the alibi witness testify "was based on sound trial strategy and that this decision did not fall below the standard of

---

[2] This rule authorizes an affirmance when in an appeal of a criminal, quasi-criminal or juvenile matter, the Appellate Division determines that some or all of the arguments made are without sufficient merit to warrant discussion in a written opinion.

11

reasonableness." Further, the judge found the alibi witness to be incredible and not to be believed that she was with defendant at the time of the murder.

As to the denial of an evidentiary hearing with regard to Lundy's proffered testimony, Judge Ravin found an evidentiary hearing would not be helpful, and counsel's decision "was likely sound trial strategy that would not have changed the outcome of the proceeding had it been proffered." We concur and are satisfied that Judge Ravin did not abuse his discretion in denying defendant's petition without an evidentiary hearing.

*Id.* at *3.

"[F]ederal habeas law employs a 'look through' presumption." *Wilson v. Sellers*, 138 S.

Ct. 1188, 1194 (2018). In cases in which the last reasoned decision is unexplained, the federal

court should "'look through' the unexplained decision to the last related state-court decision that

does provide a relevant rationale." *Id.* at 1192.

The PCR Court denied the claim as follows-

In this case, there is no evidence that trial counsel performed in a constitutionally impermissible manner. Even though Mr. Saluti stated that he did not use Ms. Adams as a witness during the trial, he stated that he did not do so for tactical reasons. Specifically, Mr. Saluti stated that he did not believe it would be prudent to put Ms. Adams on the stand because she was a paramour of Defendant and in his experience, this would not be favorable for a defendant. Additionally, Mr. Saluti stated that when he spoke to Petitioner about what Ms. Adams remembered about the events, he said that he recalled that she did not have a good recollection of what happened. Therefore, unlike the trial attorney in *Gray*, Mr. Saluti specifically discussed his tactical reasons at the evidentiary hearing for not eliciting Ms. Adam's testimony. This Court finds that his decision was based on sound trial strategy and that this decision did not fall below the standard of reasonableness. *See Bilal*, *supra*, at *6.

More importantly, this Court did not find Ms. Adams credible. The Court does not believe that she was with Petitioner at the time of the murder because the Court did not believe that she would have been frightened by the police knocking on her door; she was not present when that occurred. The Court also does not believe that she was

> with Petitioner because the Court does not believe that her alleged fright would have prevented her from informing the police or Mr. Saluti. She knew Petitioner from elementary school and had dated him for approximately 10 years at the time of the murder. Surely someone in such a relationship would have felt compelled to exonerate her loved one from unnecessary punishment if the circumstances were such as she presented them at the hearing.
>
> Even if Mr. Saluti's performance did fall below the standard of reasonableness, Petitioner did not show how he was prejudiced by this performance. During oral argument, Petitioner asserted that his conviction was only based on circumstantial evidence and that this alibi witness would have made a good impression on the jury. Again, because the Court did not find Ms. Adams credible, the Court does not believe that Petitioner was prejudiced by Mr. Saluti's decision to not use Ms. Adams as a witness.
>
> . . .
>
> Additionally, the Court finds that Mr. Saluti's decision not to proffer Lundy's testimony that Petitioner and Mr. Ashford were friends was likely sound strategy that would not have changed the outcome of the proceeding had it been proffered.

(D.E. No. 1-6 at 12-13).

This Court has reviewed the PCR evidentiary hearing testimony which includes that of trial counsel, Gerald Saluti, and Petitioner's long-time acquaintance, Katrina Adams. (D.E. No. 6-7). Mr. Saluti testified that his trial strategy was to attack the victim's ability to identify his assailant. (*Id.* at 35). The defense's case was that the sole surviving victim could not identify the suspect. (*Id.*) Saluti further testified that it was a strategic decision not to pursue the alibi because he generally considered alibi testimony from individuals close to the defendant as being very biased. (*Id.* at 35, 38).

In light of counsel's testimony that it was his informed strategy to pursue a misidentification defense, Petitioner has not established how counsel was deficient. *See Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary."). Neither has Petitioner established how he was prejudiced by his counsel's decision not to call Adams because the PCR court found Adams' alibi-related testimony incredible. *See* 28 U.S.C. § 2254(e)(1). Moreover, the state court's ruling that Petitioner was not prejudiced by counsel's failure to proffer Rashana Lundy's testimony was not unreasonable.[3] Petitioner speculates that Lundy's testimony that Petitioner and Ashford were friends would have, *inter alia*, established that Ashford would have "called on that friendship upon being put on the ground and having a gun placed to his head prior to being shot." (D.E. No. 9 at 47). Petitioner also argues that Lundy's testimony could have corroborated Ms. Adams' testimony that the Petitioner and Ashford were friends and strengthened Adams' alibi testimony, even though Petitioner has never alleged that Lundy was with Petitioner and Adams or was aware of Petitioner's whereabouts during the time period which the offense occurred. (*Id.*)

Petitioner has not established how he was prejudiced by Lundy not being called as a defense witness. Lundy's potential testimony of what the victim would have done prior to being shot, is purely speculative. The state court's decision is not an unreasonable application of clearly established federal law. Habeas relief is thus denied.

2. Ineffective assistance of trial counsel for failing to move for a voir dire of juror number six.

Petitioner next submits that his trial counsel was ineffective for failing to move to voir dire juror number six after that particular juror articulated during jury polling that she disagreed with the guilty verdict with respect to count six- felony murder. (D.E. No. 1-1 at 21). More specifically,

---

[3] Petitioner's reliance on *Abdul-Salaam v. Sec'y Pa. Dep't of Corr.*, 895 F.3d 254 (3d Cir. 2018), is misplaced. (D.E. No. 10). There, the United States Courts of Appeals for the Third Circuit held that Petitioner was prejudiced by his counsel's failure to investigate mitigating evidence in preparation for penalty phase of capital trial.

14

Petitioner submits that the court should have inquired what juror number six meant when she told the court: "No. I'm sorry.  I have to be honest."  While Petitioner unsuccessfully raised a similar version of this claim, albeit within the context of a trial court error claim on direct appeal, it appears that he has not previously raised this particular ineffective assistance of counsel claim. Nonetheless, the Court will reach the merits of the claim.  *See* 28 U.S.C. § 2254(a)(2).

As previously outlined in the fact section of this opinion, once juror number six expressed her disagreement with the guilty verdict as to count six, the trial court noted its concern and ordered a recess.  (D.E. No. 6-5 at 20).  The following day the court continued to poll the jury as to the rest of the counts.  The jury was not unanimous in its guilty verdicts on counts eight and nine.  After the trial judge denied defense counsel's motion for a mistrial, the court declared a mistrial on counts six, seven, eight, and nine.  (D.E. No. 6-6 at 5-9, 12).  Defense counsel also presented the court with the option of further examination of juror number six.  (*Id.* at 7).  Specifically counsel stated- "at the very least I think we need to talk to the juror, so we can clarify whether or not Counts 1 through 5 has to stand."  (*Id.*)  The Court denied the request.  (*Id.* at 9).

Petitioner's claim is belied by the record.  Counsel did in fact ask the court to conduct further inquiry of juror number six after he made his application for a mistrial.  Petitioner has not raised a viable ineffective assistance claim, in light of his counsel's actions.  Habeas relief is thus denied.

3. Ineffective assistance of trial counsel for failing to challenge the sufficiency of the state's evidence with respect to the robbery charge related to David Veal.

Petitioner next submits that counsel was ineffective for failing to challenge the sufficiency of the state's evidence with respect to the robbery charge related to victim David Veal.  (D.E. No. 1-1 at 21).  More specifically, Petitioner argues that because the evidence showed that Veal's money was returned to him at some point shortly after the robbery and because the jury sent a note

asking whether a robbery had occurred if the victim's money is returned, trial counsel should have raised the issue of insufficient evidence either in an application to the court or in his closing arguments to the jury.  (*Id.* at 22-23).  It appears that Petitioner has not previously raised this particular ineffective assistance of counsel claim.  Nonetheless, the Court will reach the merits of the claim.  *See* 28 U.S.C. § 2254(a)(2).

At Petitioner's trial, the surviving victim, David Veal testified for the state.  (D.E. No. 6-3 at 20-55).  Veal testified in relevant part as follows-

> Q:     Then, what happened when they got to you?
> A:     Once they got to Avon Avenue and 18th Street, well, didn't get directly to 18th Street yet, just about there - -  two of the guys that was across the street.  One about to cross inside the street, but the - - I don't know it was like one of the guys just like started - - he was about to come on an angle straight at me.  One was crossing the street like he was going to keep going.  By the time I got ready to hang up the phone was like right there.
> They all just had a gun drew, that's all I saw, like a bunch of guns.  I'm looking around like, oh - - it's nowhere for me to run or stuff.  Hey, deal with it.  So, they like don't move.  Don't fucking move.  Don't move, don't even look at me like that.
> Q:     All three had guns?
> A:     All three of them had guns.
> Q:     And they surround you?
> A:     Yeah,  They had me like - - like when you go to the carnival, and just shooting and stuff.  It was like - - there was nothing I could do.  No way to run.  Nothing to hide behind.  It was just right there in the middle.  Like that there stopped.  I did like you said, don't move.  By the time I turned back around, it was one guy just came.  Boom, hit me in my face.  That's how I got these marks and stuff up in here.  Once he hit me in my face. I fell to the ground.
> Q:     What he hit you in the face with?
> A:     He hit me with a gun - -  like pistol whipped me.  Had me at that corner.
>                                   . . .
>
> A:     No, just one individual kicking me.  Other guy with him:  Yo, yo, no need for that.  I had already gave them all my papers and stuff out of my pocket.  ATM cards - - it was a ATM card holder.  I had $40 and a ripped 20 in there with a number on it and gave them that.

16

> Q:      Gave them $40?
> A:      I gave them everything he [sic] had.  I took the money and threw it to the ground and then I started begging.
>
> . . .
>
> Q:      Now, you said you had $40 taken from you.  Was that returned to you?
> A:      I had got everything back that was taken from me.
> Q:      When did you get that back?
> A:      I believe that night.
>
> . . .
>
> THE COURT:     I have a couple questions, Mr. Veal.  The three individuals who were with you, and approached you that night, did any of them ask you for money.
> THE WITNESS:  Yes.
> THE COURT:      They say turnover your money?
> THE WITNESS:   Yes.  They said, you know, what time it is, give it up.  So, I gave my - - I got my ATM holder, got all my stuff in it.  I gave him that.  Money and stuff is in there.  They took the money and everything I had.  Threw it to the ground.
> THE COURT:  Okay.

(D.E. No. 6-3 at 21-23, 30, 54).

Under New Jersey law, a person is guilty of robbery "if in the course of committing a theft he inflicts bodily injury or uses force upon another."  N.J. Stat. Ann. § 2C:15-1.  The United States Supreme Court articulated the standard governing a challenge to the sufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The Court held that a reviewing court must ask itself "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis original).  This standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16; *see also Orban v. Vaughn*, 123 F.3d 727, 731 (3d Cir. 1997).

Petitioner has not established how when the evidence is viewed in the light most favorable

to the prosecution, any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.  Petitioner presumes that Veal's testimony that his assailants told him "you know what time it is, give it up" did not mean that they were asking for his money.  Veal was punched, kicked and shot in the midst of him giving his money to his assailants.  The record reflects that the jury considered the fact that Veal obtained his money back and asked the court for guidance on that particular issue, before returning a guilty verdict on that particular charge.  The fact that Veal's money was returned to him does not undermine the fact that his money was taken from him with the use of force as required by the state's robbery statute.  Therefore, Petitioner has not shown a reasonable probability that the outcome of the trial would have been different had trial counsel addressed the sufficiency of the evidence with respect to the robbery of David Veal.  Habeas relief is thus denied.

B.    <u>Trial Court Errors</u>

1.    Trial Court Erroneously Closed the Courtroom to the Public

Petitioner next submits that the trial court erroneously closed the courtroom to the public, thereby violating his right to a public trial and the public's right to attend the trial.  (D.E. No. 1-1 at 23).  Petitioner raised this very claim on direct appeal.  *See Porter*, 2007 WL 2460179 at *5.  The Appellate Division denied the claim as follows-

> We need not address the issues relating to the closing of the courtroom on the morning the jury returned to complete delivery of the verdict.  As we have observed, the only issues before us in this appeal bear upon the guilty verdicts on the first four counts.  Since we have concluded there is no basis for a reversal of the convictions as to those charges, it is of no consequence whether or not the trial court's stated reasons for closing the courtroom to receive the complete verdicts on the remaining counts withstand scrutiny by the standards of *State v. Cuccio, 350 N.J. Super. 248 (App. Div.), certif. denied, 174 N.J. 43 (2002).*

*Id.*

As previously outlined in the background section of this opinion, after the jury gave its verdict on count six, the felony murder charge, a spectator ran out of the courtroom after making an audible outburst. *See Porter*, 2007 WL 2460179. The next day, the trial court made the decision to close the courtroom to the public before the jury was brought in to deliver its verdicts on two remaining counts. The trial court gave the following explanation for its reasons to close the courtroom-

> There were representatives of the defendant's family here. There were representatives of the victim's family here. You could see on the faces of the jurors the strain of the day. It was late in the day, and when the initial verdict was announced in court as guilty on felony murder, the defendant – a member of the defendant's family ran out of the courtroom screaming and crying. Again, to add to the highly charged emotional atmosphere. It's not to criticize one way or another. When a family member is found guilty of a felony murder, certainly the Court could understand why a family member would react that way, but at that point in time it was a highly charged atmosphere. I think it did have an effect on what Juror Number 6 did, but whatever- - whether it did or didn't at that point in time at 4:35 in the afternoon, the Court decided to break the proceedings, and ask the jurors to come back today to continue in this matter.
>
> I have indicated to my officers that there's not to be any members of the defendant's family or the victim's family in the courtroom this morning while I take the tally on the final two counts, and I have done that because of what occurred yesterday afternoon because it had the potential to effect the final votes on the polling of these jurors, and it could just as easily be the victim's family member who could run out, and start carrying on, too. I'm doing it for security reasons. I must say that, you know, it is a concern of this Court, you know in such a case like this where stakes are so high there are security issues. I was concerned about security issues yesterday afternoon when the Sheriff's Department could send no more than three officers on a case like this. They had no more manpower to send us at 4:35 in the afternoon, and this Court felt that we needed, at least, six officers here. We have a defendant in custody. We have 13 jurors. We have a defense counsel, assistant to defense counsel. We have a prosecutor, we have personnel. We have the defendant's family and victim's family. For all those reasons the Court cut short the proceedings, and quite frankly - - and another reason the Court didn't know what to do. I wanted to give the opportunity to all of

the parties, counsel to research it, the Court to research it.  And my
research reveals, and this is the way we should go.

(D.E. No. 6-6 at 5-6).

In *Waller v. Georgia*, 467 U.S. 39, 48 (1984), the United States Supreme Court articulated
the following test to determine whether a courtroom closure violates a defendant's Sixth
Amendment right to a public trial.  "[T]he party seeking to close the hearing must advance an
overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to
protect that interest, the trial court must consider reasonable alternatives to closing the proceeding,
it must make findings adequate to support the closure."  *Id.*

At the outset, the Court notes that while the trial court did prohibit the defendant's and the
victims' families from attending the remainder of the trial, the record does not reflect that the
courtroom was closed entirely to the public.  Nonetheless, Petitioner has not established how the
trial court's decision was inconsistent with *Waller*.  By the time the court made the decision to
limit members of the public from being present in the courtroom, the jury had returned its verdicts
on the majority of the charges against Petitioner.  The Court stated that its decision to close the
courtroom was in response to an outburst by the defendant's family member after the felony
murder verdict was read and juror number six expressed concern about the verdict related to that
charge, as well as a security measure taken in light of the limited court security personnel and the
number of people in the courtroom on the prior day.  The trial judge sought to protect the sanctity
of the proceeding and the jury's ability to render a verdict without interference or influence from
either the victims' or the defendant's family members and supporters.  *United States v. Flanders*,
845 F. Supp. 2d 1298, 1303 (S.D. Fl. 2012) ("Allowing members of the public to freely come and
go during the parties' closing arguments would have distracted members of the jury and inhibited
their ability to perform their important function.")  Second, based on the Court's response to an

20

outburst by the defendant's family member, the trial judge limited the victims' and defendant's family members, but not necessarily all members of the public. *See Flanders*, 845 F. Supp. 2d at 1302 ("To the extent that a substantial reason for partial closure is needed, however, appears to be tempered by the recognition of a trial judge's ability, in the interest of justice, to impose reasonable limitations on access to a trial" (internal citations and quotation marks omitted)).  Additionally, the limitation on spectators was limited to the final phase of the trial, specifically the jury's verdict on the last two counts. *Id.*  (The courtroom was open to the public at every stage of the proceeding except for the time during which the parties gave their closing arguments to the jury.")  Third, the trial court's decision to limit family members from observing the proceeding was a reasonable alternative to closing the proceeding to the public altogether.  Finally, the Court articulated its findings to support why the limitation on spectators was necessary.

In light of this, Petitioner has not established how the trial court's decision to limit spectators in the courtroom after the jury had returned a verdict on all but two remaining counts violated his right to a fair trial.  The state court's decision was not an unreasonable application of the facts nor was it in violation of clearly established federal law.  Habeas relief is thus denied.

2. The trial court erroneously failed to conduct further inquiry of juror number six after she made a comment that suggested she was uncomfortable with one of the verdicts.

Petitioner next submits that the trial court erroneously failed to conduct further inquiry of juror number six after she articulated during jury polling that she disagreed with the guilty verdict with respect to count six which charged him with felony murder.  (D.E. No. 1-1 at 23-29).  More specifically, Petitioner submits that the court should have inquired what juror number six meant when she told the court: "No. I'm sorry.  I have to be honest."  Petitioner unsuccessfully raised this claim on direct appeal.

21

The Appellate Division denied the claim as follows-

> The trial judge was correct in ruling that the difficulties that occurred when the jury was polled on Count Six and thereafter had no bearing on the validity of the jury's verdict on Counts One through Five.
>
> In *Milton*, *supra,* 178 *N.J.* 421, a three-count indictment was at issue: possession of a controlled dangerous substance (CDS), possession of the CDS with intent to distribute, and distribution or intent to distribute the CDS within 500 feet of public housing. The jury foreperson announced guilty verdicts as to all three counts. When the jury was polled, "[t]he poll on Count One was uneventful, with each juror clearly stating 'guilty.' " *Id.* at 427. One juror hesitated in response to the poll on Count Two, however; and, when the trial court inquired of that juror, she responded, following another hesitation and prompting by the court: "Um guilty. That was the verdict I gave." *See id.* at 427-28. The Supreme Court held, with three justices dissenting, that the trial court, in the circumstances developed, should not have accepted this response as a conclusive indication of the juror's vote, but should, rather, have inquired further, even to "interview[ ] the juror *in camera* to provide her an opportunity to explain her hesitation, unhampered by the pressure that may have undermined the deliberation process." *Id.* at 442. "[T]he circumstances required clarification." *Id.* at 440. The Court, therefore, reversed the conviction on Count Two. The Court also reversed the conviction on Count Three because of its factually overlapping relationship with Count Two. The matter was remanded for a new trial on Counts Two and Three, but the decision had no effect on the conviction for possession of CDS in Count One.
>
> In a similar vein, in this matter, we discern no reason to disregard the verdict on the first five counts in this matter, validly rendered in every way, because of the problems that occurred when the jury was polled regarding subsequent counts. And, we see no relationship between the guilty verdicts, especially those on Counts Two, Three and Four, which bore upon defendant's conduct regarding the surviving victim, and the handling of charges relating to the deceased victim and, generally, to both victims that eventuated in the problems we have described. *Cf. State v. Schmelz,* 17 *N.J.* 227, 232-37 (1955); *State v. Jenkins,* 349 *N.J.Super.* 464, 474-76 (App.Div.2002); *State v. Millett,* 272 *N.J.Super.* 68, 92-98 (App.Div.1994).
>
> We reject defendant's argument, based on *Rugura v. Lau,* 119 *N.J.* 276, 281 (1990), of a deficiency in the form of the questions asked by the court in polling the jury on Counts One through Five. In

inquiring about Counts One and Two, the court stated the reported verdict and instructed: "Please state yes if this is your verdict[.] State no if this is not your verdict." This form of inquiry is proper. *See ibid.* To be sure, as to Counts Three and Four, the court incorrectly, *see ibid.,* abbreviated its inquiry regarding Count Three: "have you reported the defendant guilty of attempted murder?" and in respect of Count Four: "have you reported the defendant guilty of aggravated assault?" These were deviations from accepted form, which "is intended to determine whether each juror *still assents* to the verdict[.]" *Milton, supra,* 178 *N.J.* at 441. In polling the jury on Counts Five and Six, however, the court reverted to the form of inquiry used in respect of Counts One and Two. The deviation from the appropriate form regarding Counts Three and Four is inconsequential, for the jury clearly knew from the form of inquiry as to Counts One and Two what information the court was seeking.

*Porter*, 2007 WL 2460179 at *4-5.

As previously outlined in the background section of this opinion, once juror number six expressed her disagreement with the guilty verdict as to count six, the trial court noted her concern and ordered a recess. (D.E. No. 6-5 at 20). In addition to moving for a mistrial, defense counsel also presented the court with the option of further examination of juror six. (D.E. No. 6-6 at 7). Trial counsel argued that although juror six explicitly articulated dissent when polled on her verdict with respect to count six, counsel observed her shaking her head, as if she was in disagreement, while the foreperson was providing the first five guilty verdicts. The trial court accepted counsel's representation but declined to conduct further inquiry. The trial court ruled that further inquiry was not necessary because she only expressed hesitation about her verdict with respect to count six, the felony murder charge. (*Id.* at 8-9). After the trial judge denied defense counsel's motion for a mistrial, the jury gave its verdict on the two remaining counts. The jury was not unanimous in its guilty verdicts on counts eight and nine. Ultimately, the court declared a mistrial on counts six, seven, eight, and nine. (*Id.* at 5-9, 12).

23

Petitioner has not established how the trial court's decision not to inquire further of juror six implicated his right to a trial by an impartial jury.  Petitioner argues that the state court's decision runs afoul of the Supreme Court's opinion in *Pointer v. Texas*, 380 U.S. 400 (1965), as well as non-binding precedent from other circuit courts of appeals.  The Court notes that the *Pointer* Court's holding applied to the accused's Sixth Amendment right to confront witnesses. *Id.* at 406-408.  Not only has Petitioner not cited to any relevant controlling case law to support his claim, but his argument rests on the premise that although juror number six voiced her concern about the guilty verdict with respect to count six, she may have actually been conflicted with the guilty verdicts in the preceding five counts as well.  Counsel's speculation was considered by the trial court before it was rejected.  As for juror number six's comments suggesting her hesitation about the guilty verdict in count six, the trial court responded by declaring a mistrial.  Petitioner has not established how his right to a jury trial was violated by the trial court's manner of handling juror number six's reservations.  *See United States v. Fiorella*, 850 F.2d 172 (3d Cir. 1988) (upholding a conviction where the trial court continued to poll the jury after a juror indicated he disagreed with the verdict, and instructed the jury to continue to deliberate, resulting in a unanimous guilty verdict the following day).  Consequently, the state court's decision was not an unreasonable application of clearly established federal law.  Habeas relief is thus denied.

## V.      CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter.  *See* Third Circuit Local Appellate Rule 22.1.  The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Based on the discussion in this Opinion, Petitioner has not made

a substantial showing of denial of a constitutional right, and this Court will not issue a certificate of appealability.

## VI.    CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied.

An appropriate order follows.

Dated  April 29, 2020

THE HONORABLE MADELINE COX ARLEO
United States District Judge